UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.     3:04-cr-206-J-20MCR

JAMAL SHAKIR

_____

### REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on the Motion to Suppress Handgun and Items Seized During "Inventory Search" of Defendant Jamal Shakir's Vehicle (Doc. No. 434). Pursuant to Rules 12 and 41 of the Federal Rules of Criminal Procedure, Defendant Jamal Shakir ("Shakir") seeks to suppress the following: (1) a handgun; (2) a cardboard box containing cocaine residue; (3) an electronic scale; (4) a fork; (5) a glass beaker; (6) a bag of baggies; (7) a brass house key; and (8) ammunition. Generally, Shakir contends the items were seized as the result of an unlawful search of his vehicle. Because this matter was referred for report and recommendation, the undersigned conducted an evidentiary hearing on July 12, 2005.

I.     Report

A.     Factual Summary

As part of an ongoing narcotics investigation led by Detective Charles Bates ("Detective Bates") of the Jacksonville Sheriff's Office ("JSO"), the Circuit Court of the

---

[1] Any party may file and serve objections hereto within TEN (10) DAYS after service of this opinion. Failure to do so shall bar the party from a *de novo* determination by a district judge of an issue covered herein and from attacking factual findings on appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a) and (e); Local Rule 4.20, United States District Court for the Middle District of Florida.

Fourth Judicial Circuit, in and for Duval County, Florida issued an order authorizing the interception of wire communications of two cellular telephones used by Shakir. *See* Government's Exhibits 8A-11C. Pursuant to the order, Detective Bates intercepted more than 850 alleged drug-related conversations. *See* Government's Exhibit 1. Detective Bates subsequently obtained a state-issued warrant for Shakir's arrest on July 6, 2004 and provided notice of Shakir's arrest warrant to other JSO officers. Id.

On July 11, 2004, at the direction of Detective Bates, JSO officers were conducting surveillance of a residence located at 5824 Marigold Road, Jacksonville, Florida ("Marigold residence"), where they believed Shakir was located and in connection with executing a search warrant for the premises. Sergeant James David Carpenter ("Sergeant Carpenter"), an officer participating in the surveillance, observed a pick-up truck he believed to be Shakir's leave the residence. Sergeant Carpenter, who was driving an unmarked vehicle, followed the pickup truck and relayed the information to Detective Bates. Detective Bates instructed Sergeant Carpenter to contact an officer operating a marked JSO patrol car to stop the pickup truck. Responding to this request, Sergeant Carpenter contacted Patrol Officer Steven Keeling ("Officer Keeling") who was nearby. Sergeant Carpenter provided a description of the pickup truck, advised that the driver was of interest and instructed Officer Keeling to effectuate the stop.

Officer Keeling subsequently observed the pickup truck being followed by Sergeant Carpenter and effectuated the stop. Shortly thereafter, Detective Bates arrived at the scene and advised Shakir that he was under arrest. Detective Bates then

searched the pickup truck where he discovered a loaded handgun in the center console. The pickup truck was subsequently driven to a JSO parking lot; subjected to a complete inventory search; and transported to the JSO impound lot for storage. During the complete inventory of the vehicle, the additional items were discovered.

### B. Summary of the Parties' Positions

Shakir maintains the warrantless search of his vehicle was conducted in violation of his Fourth Amendment Rights. In his memorandum, providing virtually no factual basis, Shakir contends the instant matter involves an inventory search, rather than a search incident to lawful arrest. *See* Doc. No. 434 at p. 4. Accordingly, Shakir argues, in conducting the inventory search, JSO officers' failed to act in accordance with standardized procedure. The Government counters by arguing Shakir's instant motion to suppress should be denied because there was a valid warrant for his arrest and because the search of his vehicle was conducted pursuant to JSO's inventory procedures.

## II. Recommendation

At the outset, the undersigned rejects Shakir's characterization of the instant matter. Based upon the undersigned's review of the evidence, the issues presented before the Court involve Shakir's arrest and the admissibility of evidence subsequently seized.

### A. Evidence Regarding Shakir's Arrest

The Government presented the witness testimony of Sergeant Carpenter, Officer Keeling and Detective Bates. Additionally, the Government admitted into evidence

Shakir's July 6, 2004 arrest warrant and the supporting affidavit. Notably, Shakir presented no witness testimony and entered his arrest and booking report into evidence.

### 1. Officers' Account of Shakir's Arrest

In their testimony, the officers collectively provided the following factual summary of events surrounding Shakir's arrest. Detective Bates became familiar with Shakir early in his investigation as a result of surveillance and the cellular telephone numbers issued under Shakir's name. (Tr. 130).[2] Pursuant to the wiretap authorizations, Detective Bates intercepted more than 800 drug-related conversations involving Shakir and others. (Tr. 131). Based upon information obtained from the intercepted calls, Bates prepared an affidavit in support of a warrant for Shakir's arrest and detailed three (3) telephone conversations between Shakir and Co-Defendant Bruce Mainor ("Mainor") intercepted on May 3, 2004; May 7, 2004 and May 24, 2004, respectively. In his affidavit, Detective Bates concluded the calls involved negotiations between Shakir and Mainor for the purchase of cocaine. Upon issuance of the Shakir arrest warrant, Detective Bates notified other officers involved in the investigation of its existence.

On July 11, 2004, Detective Bates met with other officers, including the JSO Special Weapon and Tactics ("S.W.A.T.") team, to coordinate execution of the search warrant for the Marigold residence. As part of the effort, Detective Bates provided

---

[2]Pending entry of the certified transcript of this proceeding, citations to the transcript in this Report and Recommendation refer to an unofficial copy of the transcript provided to the Court.

Sergeant Carpenter with a thorough physical description of Shakir accompanied by photographs and a description of Shakir's pickup truck. (Tr. 97). Detective Bates then instructed Sergeant Carpenter to conduct surveillance of the Marigold residence and provide intelligence. Id.

During his surveillance, Sergeant Carpenter observed Shakir leaving the Marigold residence in his pickup truck. (Tr. 97). In an unmarked car, Sergeant Carpenter began following Shakir and subsequently relayed the information to Detective Bates. Id. In turn, Detective Bates instructed Sergeant Carpenter to stop the vehicle. (Tr. 98). Using his police radio, Sergeant Carpenter provided a description of Shakir's pickup truck as well as the unmarked vehicle he was driving; announced that there was warrant for Shakir's arrest; advised that Shakir was possibly armed; and requested that the nearest patrol officer effectuate the stop. Id.

Officer Keeling, on patrol, observed Shakir driving the pickup truck previously described. (Tr. 105-106). Officer Keeling then pursued the vehicle and flashed his blue lights signaling Shakir to stop. (Tr. 106). Shakir stopped the pickup truck and was subsequently handcuffed and placed in the back of Officer Keeling's patrol car. (Tr. 106-108). Other officers, including Sergeant Carpenter and Detective Bates, arrived at the scene of the stop. (Tr. 107, 111). Bates informed Shakir that he was under arrest and advised him of his Miranda rights. (Tr. 144-145). Detective Bates then entered Shakir's pickup truck, conducted a quick inventory search and discovered a loaded handgun in the center console. (Tr. 145). The pickup truck was seized for forfeiture by

a detective at the scene and Shakir was transported by Officer Keeling to the county jail for processing. (Tr. 117, 118, 146, 151, 161).

### 2. The Warrant Issued for Shakir's Arrest

The Government entered into evidence the original warrant for Shakir's arrest and the supporting affidavit made by Detective Bates. While the affidavit bears the signature of the issuing state court judge, the arrest warrant does not. Accordingly, notwithstanding the defective warrant, the Government sought to establish probable cause for Shakir's arrest. To that end, the Government questioned Detective Bates regarding his basis for seeking the warrant.

Detective Bates testified to detailed information obtained from several intercepted phones calls, including the May 2004 calls between Shakir and Mainor. (Tr. 130-140). Detective Bates further testified that, as a result of information obtained from the intercepted calls, he conducted surveillance and observed meetings between Shakir and Mainor. Id. Additionally, Detective Bates testified that, on one occasion, he and other officers retrieved a kilogram of cocaine from a trash can after observing a meeting between Shakir and Mainor. (Tr. 140). When questioned whether he believed he had a legal basis for arresting Shakir on July 11, 2004, Detective Bates replied: "Yes, sir, I did." Detective Bates testified that he was unaware the warrant had not been signed until approximately July 8, 2005, when the document was unsealed.

### B. Recommendation Regarding Shakir's Arrest

Upon review of the evidence presented, it became abundantly clear to the undersigned that prior to submitting their memoranda regarding the instant motion,

neither party was aware that Shakir's arrest warrant was unsigned. Therefore, in the interest of fairness, prior to concluding the evidentiary hearing on this matter, the undersigned provided each party an opportunity to present additional arguments for the Court's consideration.

Accordingly, the Government presented four additional arguments. First, notwithstanding the warrant, there was independent probable cause to lawfully arrest Shakir. (Tr. 172-173). Second, because law enforcement stopped and arrested Shakir on a public roadway, issuance of an arrest warrant was unnecessary. Id. Third, the good faith exception to the warrant requirement is applicable to the facts presented in this case. Id. Fourth, the search of Shakir's vehicle was conducted incident to his lawful arrest. Likewise, counsel for Shakir maintained he found the unsigned warrant troubling as well as the Governments's failure to conclusively establish good faith reliance by JSO officers and the warrantless search of Shakir's vehicle.[3]

### 1. The Unsigned Warrant for Shakir's Arrest

The Fourth Amendment contains no explicit signature requirement. It does however require probable cause for issuance of a warrant. Therefore, while an unsigned warrant may not be *per se* insufficient under the Fourth Amendment, it must be clear to the arresting officers that the substantive requirements of the Fourth Amendment were met, i.e., in this case, that a neutral and detached magistrate made a

---

[3]Counsel for Shakir stated that he preferred to raise additional arguments in a written response to be submitted to the Court. (Tr. 175:10-12). Based upon the Court's review however, to date, counsel has failed to file any such response.

finding of probable cause to issue the warrant. Here, the undersigned finds that particular requirement was met.

Based upon extensive review of Shakir's original arrest warrant and Detective Bates' affidavit in support, the undersigned is convinced the issuing state court judge simply inadvertently failed to sign the arrest warrant, particularly in light of the fact that the judge signed and dated Detective Bates' affidavit and partially completed the arrest warrant. *See* Government's Exhibit No.1. Likewise, the undersigned is further convinced that, based upon Detective Bates' representations, the state court judge did in fact make a determination of probable cause to issue the warrant for Shakir's arrest. As such, the issuing state court judge's determination that probable cause existed for the arrest warrant is entitled to great deference. Illinois v. Gates, 461 U.S. 213, 236 (1983) *quoting* Spinelli v. United States, 393 U.S. 410, 419 (1969); *see also* Massachusetts v. Upjohn, 446 U.S. 727, 732-733 (1984). With this deferential standard in mind and based upon the sufficiency of Detective Bates' affidavit as well as the unsigned arrest warrant, the undersigned finds there was in fact probable cause to support issuance of the warrant.

2. **Probable Cause Determination**

Notwithstanding issuance of the defective warrant, the undersigned further finds there was in fact probable cause to arrest Shakir. To determine whether an officer had probable cause to arrest an individual, a court examines the events leading up to the arrest, and then decides whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. *See e.g.* Illinois v.

Gates, 462 U.S. 213, 230-231 (1983) (opinion that the totality of the circumstances approach is consistent with treatment of probable cause); Brinegar v. United States, 338 U.S. 160, 175-176 (1949) (probable cause exists where the facts and circumstances within the officers knowledge and of which they had reasonably trustworthy information are sufficient to warrant reasonable belief that an offense has been committed).

Detective Bates testified that he became familiar with Shakir early in his investigation as a result of surveillance and through two cellular phones used by Shakir. In his testimony, Detective Bates provided detailed accounts of information acquired from the intercepted calls such as names, dates, meeting times and places. Detective Bates further testified that much of the information was confirmed through his follow-up surveillance of Shakir and Mainor. Based upon the information gathered as part of the ongoing investigation as well as their belief that a valid warrant had been issued, officers arrested Shakir on July 11, 2004, prior to executing the search of the Marigold residence. The undersigned believes it is an entirely reasonable inference from the facts presented that, at minimum, Shakir had purchased cocaine from Mainor. Thus a reasonable officer could conclude there was probable cause to believe Shakir

committed a crime.[4]  Accordingly, the undersigned finds Shakir was not unlawfully arrested.[5]

### C. Recommendation Regarding Admissibility of the Items Seized

Shakir contends the officers conducted a warrantless search of his vehicle. Specifically, Shakir asserts at the time of his arrest, the pickup truck was not impeding traffic and posed no threat to public safety. Shakir further asserts, prior to impounding, he was not provided an opportunity to arrange retrieval of the vehicle by a responsible party. Accordingly, he argues, in conducting their search, the officers failed to comply with standardized inventory procedures. The Government, on the other hand, argues the inventory search was conducted in compliance with JSO's procedures for impounding vehicles. Alternatively, the Government argues: (1) the search of Shakir's vehicle occurred incident to his lawful arrest; and (2) the good faith exception to the warrant requirement is applicable to the facts presented in this case.

The United States Supreme Court has held that inventory searches are consistent with the Fourth Amendment. South Dakota v. Opperman, 428 U.S. 364, (1976). The validity of an inventory search, however, hinges on the legality

---

[4]The Court notes Officer Keeling effectuated the stop at the direction of Sergeant Carpenter and Detective Bates. In Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560 (1971), the Supreme Court stated that police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Id. at 568.

[5]In United States v. Watson, 423 U.S. 411 (1976), the Supreme Court held that the warrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment. Based upon the foregoing however the undersigned does not address the Government's alternative argument that, because Shakir was arrested in a public place, no warrant was required.

of the decision to impound the car. The decision to impound a car must be made according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity. Colorado v. Bertine, 479 U.S. 367, 375, 107 S. Ct. 738 (1987).

When police officers take custody of a vehicle, they may conduct a "reasonable" inventory search of that vehicle, as an exception to the warrant requirement of the Fourth Amendment. Colorado v. Bertine, 479 U.S. at 371. However, such an impoundment and inventory search must be conducted according to standardized criteria. Id. at 374, n.6. In evaluating the law of inventory searches the Eleventh Circuit stated:

> The 'contours' of the right appear to be as follows: Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, a law enforcement officer may impound the vehicle, so long as the decision to impound is made on the basis of standardized criteria and on the basis of 'something other than suspicion of evidence of criminal activity.' If the vehicle has been lawfully impounded, the law enforcement officer may conduct an inventory search, including a search of closed containers, provided the search is conducted pursuant to standardized criteria. Because an inventory search is an exception to the Fourth Amendment's warrant requirement, however, the government officer has the burden to show that the requirements of the inventory search exception have been met.

Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992). With respect to the items seized, the Government presented the testimony of Detective Bates. The Government also entered into evidence a copy of JSO's impoundment policy and procedures and notice of the impoundment report regarding Shakir's pickup truck.

As defined by the JSO policy for disposition of motor vehicles, "forfeiture is the transfer of ownership of a motor vehicle, which has been used in violation of the Florida Contraband Forfeiture Act, FSS 932.701-932.707[,] to the seizing agency." *See* Government's Exhibit 2, Office of the Sheriff, Consolidated City of Jacksonville, Operational Order 8.4.13 ("JSO's operational order") at p. 2. When questioned about the purpose of searching Shakir's vehicle following his arrest, Detective Bates testified that, well before Shakir's arrest, he as well as other officers knew the vehicle was to be seized for forfeiture; therefore, as a common practice, Detective Bates entered the vehicle to conduct a quick inventory search. (Tr. 145:23-146:23). Detective Bates further testified the vehicle was being forfeited because officers had observed numerous "drug deals" in it. Id. Therefore, based upon review of the evidence presented, the undersigned finds the Government did meet its burden in establishing Sharkir's vehicle was impounded for some reason other than suspicion of evidence of criminal activity. Shakir's pickup was impounded for the purpose of transferring ownership to JSO, the seizing agency.

The next issue presented is whether the officers impounded the vehicle in compliance with JSO's standardized criteria. Detective Bates testified that after conducting the quick inventory of Shakir vehicle, it was transported to a JSO lot by a detective at the scene; subjected to a complete inventory search; and then transported to the impound lot for storage. (Tr. 145).

In sum, JSO's operational order provides that a complete inventory be conducted on all vehicles prior to impoundment and storage at the impound lot. Regarding

-12-

transport of an impounded vehicle, JSO's operational order further provides that when a vehicle must be towed, an approved wrecker must be used.  Additionally, the procedures grant officers discretion in determining when towing is required as evidenced by several provisions which, under certain circumstances, allow the officers to handle a vehicle according to an arrested owner's request.[6] Contrary to Shakir's contention, an officer does not violate standardized criteria by seizing a vehicle even though it is not impeding traffic or posing a threat to public safety.  See Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992). Additionally, there is no authority to suggest that officers were required to provide Shakir an opportunity to make alternative arrangements for disposition of the vehicle.  Accordingly, based upon review of the evidence, the undersigned finds JSO officers, including Detective Bates, complied with standardized criteria in conducting the inventory search of Shakir's pickup truck.[7]

Therefore, after due consideration, it is

**RECOMMENDED:**

The Motion to Suppress Handgun and Items Seized During "Inventory Search" of Defendant Jamal Shakir's Vehicle (Doc. No. 434) be **DENIED.**

---

[6]At an arrested owner's request, an officer may release a vehicle to another individual or leave the vehicle lawfully parked and secured.  See JSO's operational order at pp. 4-10.

[7]Based upon the foregoing, the undersigned does not address the Government's alternative arguments.

DONE AND ORDERED at Jacksonville, Florida this 5th day of August, 2005.

**MONTE C. RICHARDSON**
United States Magistrate Judge

Copies to:

Counsel of Record

Any Unrepresented Party